CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

12/6/2024
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
        DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division**

| | |
|---|---|
| CLIFTON WILKINS, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>ENGLISH CONSTRUCTION COMPANY, INC.,<br><br>        Defendant. | Case No.  6:24cv00059<br><br>Jury Demand<br><br>Class Action |

## CLASS ACTION COMPLAINT

Plaintiff Clifton Wilkins ("Plaintiff"), brings this Class Action Complaint against Defendant English Construction Company, Inc. ("Defendant" or "English"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsel's investigation, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.    Plaintiff brings this class action complaint against Defendant for its failure to properly secure and safeguard the personally identifiable information ("PII") of Plaintiff and other similarly situated current and former employees of Defendant totaling at least 6,704 individuals ("Class Members"), in a double-extortion ransomware attack, including their names, Social Security numbers, drivers' license numbers, dates of birth, and addresses (the "Data Breach").[1]

2.    According to English's November 7, 2024, notice to Plaintiff, it discovered suspicious activity in late September, though it does not say when, and later determined that it had

---

[1] Exhibit A, Defendant's Notice of Data Breach to Plaintiff Clifton Wilkins; Office of the Maine Attorney General, *Data Breach Notifications: English Construction Company*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/669a7981-5d96-44c1-94ea-662cadff6d60.html (last visited Nov. 20, 2024).

experienced a ransomware attack.[2]

3.      The hackers had access to several of Defendant's servers and claims to have removed files containing Plaintiff's and the proposed Class Members' PII, including their employment records.[3]

4.      On information and belief, Lynx was the group that infiltrated Defendant's systems.[4]

5.      Lynx is known to perform double-extortion attacks whereby it performs a ransomware attack after exfiltrating valuable data and files.[5]

6.      Though it is standard practice, Defendant has not notified affected persons regarding when the hackers first gained access to its information systems or how long they had such access. This lack of information after its investigation strongly implies that Defendant does not know when the hackers infiltrated its systems or how long they had such access.

7.      Regardless, the information Defendant has announced makes clear that it did not know about the infiltration and exfiltration of data until after the hackers had deployed their ransomware.

8.      In other words, the hackers were able to infiltrate Defendant's information systems, perform the necessary reconnaissance tasks required to locate files containing Plaintiff's and the proposed Class Members' PII, and then exfiltrate that data all without setting off alarm bells until they chose to announce themselves by deploying ransomware and encrypting Defendant's servers.

---

[2] Exhibit A.
[3] *Id.*
[4] *English Construction Company*, BREACHSENSE, https://www.breachsense.com/breaches/english-construction-company-data-breach (last visited Nov. 20, 2024).
[5] Rapid7 Labs, *Ransomware Groups Demystified: Lynx Ransomware* (Sept. 12, 2024), https://www.rapid7.com/blog/post/2024/09/12/ransomware-groups-demystified-lynx-ransomware.

9.      This lack of system awareness likely means that Defendant failed to implement the necessary logging, monitoring, and alerting systems that are industry standard and necessarily required in any reasonable cybersecurity program because they are precisely the tools needed to identify malicious activity in a timely manner and they are the tools needed to capture the forensics artifacts necessary to enable forensics investigators to determine what happened and when.

10.     As a result of Defendant's failures to implement and maintain reasonable and industry standard cybersecurity safeguards, Plaintiff and the proposed Class Members have suffered an invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

## PARTIES

11.     Plaintiff Clifton Wilkins is a natural person and citizen of Virginia, where he intends to remain.

12.     Plaintiff Wilkins was an employee of Defendant for about eight years.

13.     Defendant English Construction Company, Inc. is a corporation organized under the laws of Viginia, with its principal place of business in Lynchburg, Virginia and registered agent in Roanoke, Virginia.

14.     Defendant English Construction is a large multi-state construction company that employs more than 600 people at any given time and generates about $278 million in revenue each year.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act because the amount in controversy exceeds $5,000,000, the number of class members is at least 6,704, and minimal diversity exists, as is evidenced by the fact that Defendant provided notice to

the Maine Attorney General's office.

16.     The Court has personal jurisdiction over Defendant because it is at home in this State.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is at home in this District, which is also where the events giving rise to this Class Action occurred.

## ADDITIONAL FACTUAL ALLEGATIONS

18.     The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

19.     Defendant made implicit promises to Plaintiff and Class Members that their PII would be kept safe and confidential, and that the privacy of that information would be maintained.

20.     Plaintiff's and Class Members' PII was provided to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

21.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep employees' PII safe and confidential.

22.     Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA" or "FTC Act"), industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

23.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

4

**Defendant's Data Breach Was Imminently Foreseeable**

24.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

25.     Data thieves regularly target institutions like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

26.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[6]

27.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

28.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

29.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data in its systems, amounting to potentially thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[6] *See* Identity Theft Res. Ctr., *2021 Data Breach Annual Report*, at 6 (Jan. 2022), https://notified.idtheftcenter.org/s.

30.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

31.    The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

**Value of Personally Identifiable Information**

32.    PII are valuable property rights.[7] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that PII has considerable market value.

33.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[8]

34.    In fact, the data marketplace is so sophisticated that individuals can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[9,10]

35.    People who agree to provide their web browsing history to the Nielsen Corporation

---

[7] See, e.g., Randall T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[8] David Lazarus, *Column: Shadowy Data Brokers Make the Most of Their Invisible Cloak* (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[9] https://datacoup.com.

[10] https://digi.me/what-is-digime.

can receive up to $50.00 a year.[11]

36.    Because of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and rarity of the data has been lost, thereby causing additional loss of value.

37.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members because of a breach.

38.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data in its network, amounting to likely thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

39.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

40.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12] The FTC describes "identifying information" as "any name or number that may be used, alone or

---

[11] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.
nielsen.com/ui/US/en/faqen.html.
[12] 17 C.F.R. § 248.201 (2013).

in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

41.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[14]

42.    For example, PII can be sold at a price ranging from $40 to $200.[15]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

43.    Based on the foregoing, the information compromised in the Data Breach is even more significant because it includes Social Security numbers and other government identification, which is significantly difficult if not impossible to change.

44.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[17]

45.    The fraudulent activity resulting from the Data Breach may not come to light for

---

[13] *Id.*

[14] Anita George, *Your Personal Data Is for Sale on The Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[15] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[16] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark.

[17] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

years. There may be a time lag between when harm occurs versus when it is discovered, and also

between when PII is stolen and when it is used. According to the U.S. Government Accountability

Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for
> up to a year or more before being used to commit identity theft. Further, once stolen
> data have been sold or posted on the Web, fraudulent use of that information may
> continue for years. As a result, studies that attempt to measure the harm resulting
> from data breaches cannot necessarily rule out all future harm.[18]

**Defendant Failed to Comply with FTC Guidelines**

46.     The FTC has promulgated numerous guides for businesses which highlight the

importance of implementing reasonable data security practices. According to the FTC, the need

for data security should be factored into all business decision making. Indeed, the FTC has

concluded that a company's failure to maintain reasonable and appropriate data security for

sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15

U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

47.     In October 2016, the FTC updated its publication, Protecting Personal Information:

A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines

note that businesses should protect the personal information they keep, properly dispose of

personal information that is no longer needed, encrypt information stored on computer networks,

understand their network's vulnerabilities, and implement policies to correct any security

problems. The guidelines also recommend that businesses use an intrusion detection system to

expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone

is attempting to hack into the system, watch for large amounts of data being transmitted from the

---

[18] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

system, and have a response plan ready in the event of a breach.

48.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

49.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential PII as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

50.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

51.     Defendant was at all times fully aware of its obligation to protect PII under the FTC Act yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendant Failed to Comply with Industry Standards**

52.    Experts studying cybersecurity routinely identify institutions that store PII like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

53.    Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

54.    Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

55.    Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

56.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in

reasonable cybersecurity readiness.

57.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**Common Injuries & Damages**

58.    Because of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); and (d) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

**The Data Breach Increases Victims' Risk of Identity Theft**

59.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' Social Security number falling into the hands of identity thieves.

60.    The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

61.    Further, the standard operating procedure for cybercriminals is to use some data,

like the Social Security numbers here, to access "fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.[19]

62.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

63.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[19] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

**Loss of Time to Mitigate Risk of Identity Theft and Fraud**

64.     Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

65.     The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

66.     By spending this time, data breach Plaintiff is not manufacturing his own harm, but is taking necessary steps at Defendant's direction and because the Data Breach included his Social Security number.

67.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

68.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and

credit record."[20]

69.    These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[21]

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

70.    Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

71.    Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

72.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

---

[20] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[21] *See* Fed. Trade Comm'n, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

**Plaintiff's Experience**

73.    Plaintiff provided his PII to Defendant as a condition of his employment.

74.    At the time of the Data Breach, Defendant retained Plaintiff's PII in its system.

75.    Plaintiff's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII.

76.    Because the Data Breach includes his Social Security number, Plaintiff is at a substantially increased risk of harm due to Defendant's failure to reasonably protect his PII. Identity thieves and fraudsters now have his Social Security number and other PII and will either use it to perpetrate identity theft and fraud or will publish or sell it to further identity thieves and fraudster for the same purpose.

77.    In addition, Plaintiff Wilkins has received numerous notifications that his information has been found on the dark web.

78.    Because of the Data Breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach, including reviewing his financial accounts and credit history. He has and will continue to monitor accounts and credit scores and has sustained emotional distress in the form of stress and anxiety due to the breach of his PII. This is time that was lost and unproductive and took away from other activities and work duties.

79.    Plaintiff suffered lost time, interference, and inconvenience because of the Data Breach and has experienced stress and anxiety due to increased concerns for the loss of his privacy.

80.    Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

81.    Because of the Data Breach, Plaintiff is at a present risk and will continue to be at

increased risk of identity theft and fraud for years to come, such that he must spend considerable time and money on an ongoing basis to try to mitigate and address these impending harms.

82.     In addition to the significantly increased risk of identity theft and financial fraud that Plaintiff must now face because of Defendant's failures, Defendant's exposure of his sensitive PII represents a serious and significant invasion of his privacy, a harm long recognized in American courts.

## CLASS ALLEGATIONS

83.     Pursuant to the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed class defined as:

> All individuals whose PII was compromised in the Data Breach and to whom Defendant sent an individual notification that they were affected by the Data Breach ("Class").

84.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

85.     Plaintiff reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

86.     The proposed Class satisfies the numerosity, commonality, typicality, and adequacy requirements under Federal Rule of Civil Procedure 23.

87.     <u>Numerosity.</u> The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The

precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

88.    _Commonality._ There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant engaged in the conduct alleged herein;

b.    Whether Defendant's conduct violated the FTC Act;

c.    When Defendant learned of the Data Breach;

d.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f.    Whether Defendant's data security systems, prior to and during the Data Breach, were consistent with industry standards;

g.    Whether Defendant owed duties to Class Members to safeguard their PII;

h.    Whether Defendant breached its duties to Class Members to safeguard their PII;

i.    Whether hackers obtained Class Members' PII via the Data Breach;

j.    Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

k.    Whether Defendant breached its duty to provide timely and accurate

notice of the Data Breach to Plaintiff and Class Members;

l.      Whether Defendant knew or should have known its data security systems and monitoring processes were deficient;

m.      What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

n.      Whether Defendant's conduct was negligent;

o.      Whether Defendant breached contracts it had with its clients, which were made expressly for the benefit of Plaintiff and Class Members;

p.      Whether Plaintiff and Class Members are entitled to damages;

q.      Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

r.      Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

89.    _Typicality._ Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, _inter alia_, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

90.    _Adequacy of Representation._ Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in

litigating class actions, including data privacy litigation of this kind.

91.    Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

92.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

93.    Further, this action satisfies Fed. R. Civ. P. 23 because: (i) common questions of law and fact predominate over any individualized questions; (ii) prosecuting individual actions would create a risk of inconsistent or varying adjudications, risking incompatible standards of conduct for Defendant, and a risk adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties

to the adjudications or would substantially impair or impede their ability to protect their interest;

and (iii) the Defendant have acted or refused to act on grounds generally applicable to the Class,

thereby making appropriate final injunctive relief or corresponding declaratory relief with respect

to the Class as a whole.

94.     Finally, all members of the proposed Class are readily ascertainable. Defendant has

access to the names and addresses and/or email addresses of Class Members affected by the Data

Breach, as is evident by Defendant's ability to send those individuals notification letters.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**NEGLIGENCE AND NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

95.     Plaintiff incorporates the above allegations as if fully set forth herein.

96.     Plaintiff and Class Members provided their non-public PII to Defendant as a

condition of his employment with Defendant.

97.     Defendant had full knowledge of the sensitivity of the PII and the types of harm

that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

98.     By assuming the responsibility to collect and store this data, Defendant had duties

of care to use reasonable means to secure and to prevent disclosure of the information, and to

safeguard the information from theft.

99.     Defendant had duties to employ reasonable security measures under Section 5 of

the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce,"

including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable

measures to protect confidential data.

100.     Defendant's duty to use reasonable security measures also arose under the common

law, and as informed by the FTC Act, which mandates that Defendant implement reasonable cybersecurity measures.

101.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

102.    Defendant had and continues to have duties to adequately disclose that the PII of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

103.    Defendant breached its duties, pursuant to the FTC Act, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.    Failing to adequately monitor the security of its networks and systems, including by failing to implement reasonable monitoring, logging, and alerting systems such as EDR/XDR, data loss prevention tools, and a centralized security event management system;

    c.    Allowing unauthorized access to Class Members' PII;

    d.    Failing to detect in a timely manner that Class Members' PII had

been compromised;

   e. Failing to remove Plaintiff's and Class Members' PII it was no longer required to retain pursuant to regulations; and

   f. Failing to implement a reasonable cybersecurity incident response plan that would have enabled Defendant to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

104. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

105. Defendant's violation of the FTC Act also constitutes negligence *per se*, as those provisions are designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with data breaches.

106. Defendant has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

107. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

108. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

109. As a direct and proximate result of Defendant's conduct, Plaintiff and Class

Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

110.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

111.    Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

112.    Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

113.    Given Defendant's failures to implement the proper systems, as defined above, even knowing the ubiquity of the threat of data breaches, Defendant's decision not to invest enough resources in its cyber defenses amounts to gross negligence.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

114.    Plaintiff incorporates the above allegations as if fully set forth herein.

115.    Plaintiff and the proposed Class Members transferred their PII to Defendant as a condition of his employment.

116.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their PII.  In exchange, Defendant should have provided adequate data security for Plaintiff and Class Members and implicitly agreed to do so.

117.    Indeed, Defendant held itself out as a company dedicated to protecting the privacy of Plaintiff's and the proposed Class Members' PII.

118.    Defendant knew that Plaintiff and Class Members conferred a benefit on it in the form their PII as a necessary part of their employment.

119.    Defendant, however, failed to secure Plaintiff and Class Members' PII and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

120.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII, they would not have allowed it to be provided to Defendant.

121.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal

damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

**COUNT III**
**BREACH OF BAILMENT**
**(On Behalf of Plaintiff and the Class)**

122.    Plaintiff incorporates the above allegations as if fully set forth herein.

123.    Plaintiff conveyed his PII to Defendant lawfully as a condition of his employment with the understanding that Defendant would return or delete his PII when it was no longer required.

124.    Defendant accepted this PII on the implied understanding that Defendant would honor its obligations under federal regulations, state law, and industry standards to safeguard Plaintiff's PII and act on the PII only within the confines of the purposes for which Defendant collected Plaintiff's PII.

125.    By accepting Plaintiff's data and storing it on its systems, Defendant had exclusive control over the privacy of Plaintiff's data in that Plaintiff had no control over whether Defendant's copy of Plaintiff's PII was protected with sufficient safeguards and indeed only Defendant had that control.

126.    By failing to implement reasonable cybersecurity safeguards, as detailed above, Defendant breached this bailment agreement causing harm to Plaintiff in the form of violations of his right to privacy and to self-determination of who had/has access to his PII, in the form of requiring him to spend his own valuable time responding to Defendant's failures, and in the form of forcing Plaintiff and the Class to face years of substantially increased risk of identity theft and

financial fraud.

**COUNT IV**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

127.    Plaintiff incorporates the above allegations as if fully set forth herein.

128.    Plaintiff and Class members took reasonable and appropriate steps to keep their PII confidential from the public.

129.    Plaintiff's and Class members' efforts to safeguard their own PII were successful, as their PII was not known to the public prior to the Data Breach.

130.    Plaintiff and Class members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

131.    Defendant owed a duty to its employees, including Plaintiff and the proposed Class Members, to keep their PII confidential.

132.    The unauthorized release of PII, especially Social Security numbers, is highly offensive to any reasonable person.

133.    Plaintiff's and Class members' PII is not of legitimate concern to the public.

134.    Defendant knew or should have known that Plaintiff's and Class members' PII was private.

135.    Defendant publicized Plaintiff's and Class members' PII, by allowing it to be conveyed cybercriminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web and other malicious channels of communication (e.g., Telegram and Signal).

136.    It is therefore substantially certain that the Plaintiff's and the Class members' PII is rapidly becoming public knowledge–among the community writ large–due to the nature of the

malware attack that procured it, and the identity theft that it is designed for.

137.    Moreover, because of the ubiquitous nature of data breaches Defendant was substantially certain that a failure to protect PII would lead to its disclosure to unauthorized third parties, including the thousands of waiting identity thieves who are in a special relationship to Plaintiff and the proposed Class Members—in that those identity thieves are precisely the individuals whose aim it is to misuse such PII.

138.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Defendant's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class members' privacy by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including, but not limited to, injunctive

and other equitable relief as is necessary to protect the interests of Plaintiff and

Class Members, including but not limited to an order:

  i. prohibiting Defendant from engaging in the wrongful and unlawful acts

   described herein;

  ii. requiring Defendant to protect, including through encryption, all data

   collected through the course of its business in accordance with all

   applicable regulations, industry standards, and federal, state, or local

   laws;

  iii. requiring Defendant to delete, destroy, and purge the personal

   identifying information of Plaintiff and Class Members unless

   Defendant can provide to the Court reasonable justification for the

   retention and use of such information when weighed against the privacy

   interests of Plaintiff and Class Members;

  iv. requiring Defendant to implement and maintain a comprehensive

   Information Security Program designed to protect the confidentiality

   and integrity of the PII of Plaintiff and Class Members;

  v. prohibiting Defendant from maintaining the PII of Plaintiff and Class

   Members on a cloud-based database;

  vi. requiring Defendant to engage independent third-party security

   auditors/penetration testers as well as internal security personnel to

   conduct testing, including simulated attacks, penetration tests, and

   audits on Defendant's systems on a periodic basis, and ordering

Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed

in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xv. for a period of 7 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of actual damages, compensatory damages, and nominal damages, in an amount to be determined, and for punitive damages, as allowable by law;

E. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees, pursuant to public policy;

F. Pre- and post-judgment interest on any amounts awarded; and

G. Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demand a trial by jury on all issues so triable.

Dated: December 6, 2024                     Respectfully submitted,

                                            /s/ Devon J. Munro
                                            Devon J. Munro (VSB # 47833)
                                            **MUNRO BYRD, P.C.**
                                            120 Day Avenue, SW, Suite 100
                                            Roanoke, VA 24016
                                            Tel: (54) 283-9343
                                            Fax: (540) 283-5162
                                            dmunro@trialsva.com

                                            J. Gerard Stranch, IV (BPR # 023045) (pending *pro hac vice*)
                                            Grayson Wells (BPR # 039658) (pending *pro hac vice*)
                                            **STRANCH, JENNINGS & GARVEY, PLLC**
                                            The Freedom Center
                                            223 Rosa L. Parks Avenue, Suite 200
                                            Nashville, TN 37203
                                            Tel: (615) 254-8801
                                            gstranch@stranchlaw.com
                                            gwells@stranchlaw.com

                                            *Counsel for Plaintiff and the Proposed Class*